UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

N. JAYNE FARREN,              )
                              )
          Plaintiff,          )     CIVIL ACTION NO.
                              )     10-11103-DPW
v.                            )
                              )
MICHAEL J. ASTRUE,            )
Commissioner of Social        )
Security,                     )
                              )
          Defendant.          )
                              )


MEMORANDUM AND ORDER
February 10, 2012


     N. Jayne Farren ("Farren") appeals the final decision of the
Commissioner of the Social Security Administration (the
"Commissioner"), denying her Social Security Disability Insurance
benefits ("SSDI").  The Commissioner has moved for an order
affirming his decision, while Farren has moved for an order
reversing or remanding the Commissioner's decision.  After
consideration of the entire record, which I find provides
substantial evidence for the denial, I affirm the Commissioner's
decision.

## I.  BACKGROUND

A.  Basic Facts

     Farren was forty-four years old when she claims she became
disabled on April 1, 1998.  She applied for SSDI on February 1,
2008, when she was fifty-four years old.  She has a high-school

education, and has previously worked as a bank teller and sales clerk.  After her last job as a teller, she assisted her husband's land surveying business by answering the phone and occasionally doing paperwork and office tasks.  In her application, Farren noted that her job as a bank teller required her sometimes to lift between ten and fifteen pounds, and frequently lift less than ten pounds.  As a sales clerk, Farren frequently had to lift ten pounds.

B.    Medical History

1.    *History Within the Insured Period*

Since her early 20s, Farren consumed between three and six vodkas each night after work.  In November 1995, her primary care physician, Dr. McClellan, noted that Farren "had some abnormal liver function tests" that would require additional testing in December of 1995.  One year later, Dr. McClellan noted that Farren still had not had the tests done.

In a letter dated April 11, 2000, Dr. Wax, a dermatologist, noted that Farren had "multiple spider hemangiomata[1] on her neck and anterior chest due to her ethanol-related liver disease."  On April 19, 2000, Dr. Gardner noted that Farren complained of occasional abdominal pain which had been present for many years, but noted that an examination of her abdomen was unremarkable.

---

[1]  Spider hemangioma are small blood vessels just below the skin surface that radiate outwards from a central spot and appear like a spider's web.

2

He suggested that Farren decrease her alcohol intake, as it could be a cause of diarrhea.

On April 25, 2000, results from a blood test came back showing that Farren had enlarged red blood cells. Dr. McClellan opined that the enlarged red blood cells could be due to "the issues that we discussed in the office" or a Vitamin B12 deficiency.

In August 2000, Farren fell and injured her left shoulder. X-rays revealed fractures of the head and neck of her left humerus, but no dislocation was evident. Farren was given a sling and Demerol, and her condition improved. In September, Farren went to Dr. Oliver, an orthopedic specialist, for a follow up. X-rays showed that the fracture was aligned, and Dr. Oliver recommended that Farren continue to use the sling. He warned her that her range of motion would be somewhat limited and her shoulder would chronically be stiff as a result of the fracture, and he planned on initiating physical therapy within one to two months.

At the end of September, Farren returned to Dr. Oliver, who took x-rays and noted that the fracture was beginning to heal. Farren could abduct to 30 degrees, and while there was slight tenderness over the left humeral head, a neurovascular examination was normal. In mid-October, Farren returned for another check-up. Farren said that she continued to improve, and

Dr. Oliver observed that she now could "abduct easily to 70 degrees and then work[] through up to 150 degrees."

Dr. Oliver saw Farren again on November 16, 2000. He noted that she was able to abduct to 160 degrees with some difficulty, but no longer had tenderness over the fracture site. He opined that she could return to work on November 20, 2000 and was exceeding his expectations for the range of motion she had regained in her arm. He also noted that she had excellent bone density.

Approximately eight months later, on July 23, 2001, Farren returned to Dr. Oliver complaining of ongoing pain in her shoulder. X-rays revealed that she still had a significant fracture cleft. Farren had 170 degrees of abduction and 60 degrees of external rotation. An MRI taken in August revealed that there was a non-union of the fracture at the joining point of the head and neck of the humerus, and that the top of the humeral head had dried up and died from lack of blood flow. Dr. Oliver noted that if Farren had surgery to correct the problem, she would be limited to lifting less than ten to fifteen pounds for two to six months.

On October 3, 2001, Dr. Oliver performed surgery on Farren's shoulder, replacing a portion of the head of her humerus with a titanium prosthesis. On October 11, Farren returned to Dr. Oliver for a check up. She noted that she was doing fairly well,

and Dr. Oliver began her on a physical therapy regimen to return her to active motion.

On November 8, 2001, Farren told Dr. Oliver "that she has been doing everything at home following her surgery on her left shoulder. She has been doing the wash and carrying laundry baskets. She has now returned to work." At that visit, Farren was able to fully abduct to 170 degrees, but still exhibited slight weakness and atrophying of her deltoid.

One month later, on December 6, 2001, Farren noted that she had some discomfort with the shoulder, but had full abduction of the shoulder and external rotation to 20 degrees. On January 18, 2002, Farren reported having "virtually no pain in the shoulder."

On May 5, 2002, Farren fell at a wedding reception after having seven drinks, and went to the emergency room. X-rays revealed a "minimally displaced fracture of the distal clavicle," and Dr. Oliver thought that Farren had a grade 3 AC separation. On May 20, 2002, Farren told Dr. Oliver that her shoulder was doing better and that she was now able to lift the laundry. Dr. Oliver allowed Farren to "proceed with gentle activities on minimal overhead work." Farren told Dr. Oliver that she wanted to go back to work as a surveyor's assistant which would "require that she pound stakes." Dr. Oliver suggested that she should not lift her left arm above her head. On July 1, 2002, Farren reported "that her left shoulder seems to be better," but that

occasionally she would still have a sharp pain in it.  Dr. Oliver
noted that Farren could abduct her shoulder to 160 degrees with
some tenderness.  On January 1, 2003, Farren returned to Dr.
Oliver because while she thought her left shoulder was "doing
OK," she still had some pain.  Dr. Oliver did not understand why
Farren still had pain, because the x-rays revealed no problems
with her shoulder.

On July 30, 2003, Farren went to Dr. Saad, a dermatologist
for treatment of the telangieclatic patches on her chest, back,
and face.  Farren told Dr. Saad that the telangieclasias began
when she started taking Premphase, an oral estrogen supplement.
Dr. Saad noted that Farren's patches were clinically consistent
with estrogen influence, "[h]owever, the nature and extent of
these telangiectasias is more typically seen in alcohol
hepatitis."  Farren told Dr. Saad that she drank three or four
vodka drinks per day, and Dr. Saad suggested to Dr. McClellan
that he "consider evaluating her liver status."

    2.    *History After the Insured Period*[2]

On March 8, 2004, Farren went to Dr. Grenn with complaints
of pain in the left deltoid radiating down to her wrist.  Dr.
Grenn had an EMG/Nerve conduction study performed as well as an
MRI of Farren's cervical spine.  The MRI revealed "[s]evere

---

[2]  The parties do not dispute that Farren was last insured on
December 31, 2003.

degenerative disc changes from C3 to C7 with broadly bulging discs and prominent bony ridging.  This results in central canal stenosis at multiple levels, especially at C6-C7 where it is worse towards the left side."

On December 8, 2004, Farren went to the emergency room for respiratory failure.  The discharge summary noted that this was "one of several Jordan Hospital admissions for [Farren] who has a longstanding history of alcohol abuse and injuries secondary to that issue."  Farren had pneumonia and pleural effusion, and went into severe respiratory distress.  Doctors performed a CAT scan, which revealed significant liver disease.  Farren was put on the liver transplant list, and she reported she had not had a drink since then.

As a part of her pre-transplant preparation, Farren met with Dr. Pratt in the Pre-Transplant Clinic on August 23, 2006.  Dr. Pratt noted that Farren was experiencing severe muscle cramps. On June 25, 2007, Dr. Pratt noted that "[f]or the last year, Ms. Farren has suffered intractable, disabling nocturnal leg cramps which have been the source of considerable pain and discomfort for her."  On October 2, 2007, Farren returned to Dr. Oliver complaining of continued pain in her left shoulder.  Dr. Oliver explained that because of the condition of her liver disease, she would not be eligible for medication.

*3.  History and Evidence Submitted After SSDI Application*

On March 27, 2008, Farren saw a shoulder specialist, Dr. Warner, who informed her that due to the condition of her liver, she also would not be eligible for surgery to correct her shoulder problem.

On September 23, 2009, Dr. McClellan submitted a letter stating that he had been concerned about "irregular findings with regards to her blood," specifically "enlarged red cells which is an indicator of a possible liver problem."  He noted that Farren "chose not to follow up on my recommendations and continued the life style that I believe caused the finding of enlarged red blood cells," and that his concern about Farren's liver "was well before the diagnoses of cirrhosis in the year 2004."

On October 1, 2009, Dr. Wax prepared a letter to Farren stating that on August 10, 2000, Farren "told me that you had an enlarged liver . . . due to excessive alcohol consumption.  I advised you that the large number of spider hemangiomata were related to your poor liver function . . . ."  On October 13, 2009, Dr. Pratt submitted a letter noting that Farren's records made it "clear that the development of cirrhosis well-preceded the date of diagnosis" because the complications she experienced occur "in end-stage liver disease patients with liver failure."

1.  *Application for SSDI*

Farren filed her claim for SSDI on February 1, 2008.  She claimed that she became disabled on April 1, 1998 due to end-stage liver disease, fibromyalgia, and an arm/shoulder injury. Farren was last insured on December 31, 2003.[3]

In a function report she filled out on April 10, 2008, Farren described her daily routine to include letting the dog out and feeding it, making the bed, straightening up in the house, doing laundry twice a week, playing on the computer, reading and watching television, and making dinner, though she could not stand up and do a lot of prep work because it bothered her feet and legs.  Two afternoons per week, Farren takes care of her grandchildren.  She also drives to the supermarket and her son's house two to three times per week.  When she shops, she usually goes once per week for close to an hour.

The claim was denied on February 14, 2008, and her claim was again denied after further review on July 21, 2008.  Farren then filed a request for a hearing before an ALJ.

---

[3]  To be eligible for SSDI, Farren must show that she was insured for disability at the time she became disabled.  Under the regulations, she must show that she was fully insured and had "at least 20 [quarters of coverage] in the 40-quarter period" leading up to the quarter in which she became disabled.  20 C.F.R. § 404.130(b).

*2. The ALJ's Hearing*

On January 6, 2010, the ALJ held a hearing at which Farren and a vocational expert testified.

### I. Farren

Farren testified that her legs have bothered her since she was a teller. She stated that she used to have terrible cramps in her legs and toes when she had to stand at the teller window. She testified that she quit her job as a teller to go work for her husband's land surveying company, where she would answer phones and file paperwork. Occasionally she would go out and do plot plans with her husband to measure a house. She stopped helping her husband's company in 2004.

When the ALJ inquired as to why she thought she was disabled as of April 1, 1998, Farren replied that she felt lousy all the time, was tired and had to use the bathroom repeatedly, her stomach was tender and distended, she couldn't concentrate, and she had leg cramps. She admitted that she hadn't sought treatment for her leg cramps between 1998 and 2004.

### ii. Vocational Expert

The vocational expert ("VE"), Robert Laskey, then testified. The ALJ posed three hypotheticals to the VE containing all of Farren's residual functional capacity ("RFC") limitations that the ALJ ultimately found; the three differed only in the level of work (medium, light-only, or sedentary-only) that the

hypothetical individual could perform.  The VE testified that a
hypothetical claimant with the same age, education, and
vocational experience as Farren with a restriction to light work
and the addition of five bathroom breaks per day on top of
normally-schedule breaks, could perform Farren's past work as a
bank teller or a sales clerk.  The VE estimated that, based on
his thirty-years of experience, approximately fifty-percent of
the available bank teller or sales clerk jobs would not be
available to Farren based on the number of bathroom breaks.

The VE also testified that under the hypothetical where the
individual was limited to sedentary work, there were a
substantial number of jobs in the national economy that the
individual could perform.  For example, the VE testified that a
person of the same age, education, vocational experience, and all
the limitations in the ALJ's hypothetical could perform the job
of a receptionist, DOT code 237.367-038.[4]  The VE stated that
"nationally approximately 900,000 such jobs exist.  Within
Massachusetts approximately 22,000 such jobs exist and within the
immediate region that includes Boston, Cambridge, and Quincy
approximately 17,000 such jobs exist."  Those numbers, the VE

---

[4]  The VE also testified that jobs such as order clerk (DOT
209.567-014) and surveillance system monitor (DOT 379.367-010)
would be appropriate given the hypothetical and were available in
substantial numbers in the national and local economies.

estimated, would be reduced by fifty percent based on the number of bathroom breaks required in the ALJ's hypothetical.

### 3.  The ALJ's Decision

After finding that Farren was eligible for SSDI benefits because she had been insured at the time of the alleged disability, the ALJ concluded that Farren was not disabled within the meaning of the Act.  To reach this conclusion, the ALJ undertook the requisite five-step sequential analysis.

At step one, the ALJ found that Farren had not engaged in substantial gainful activity from April 1, 1998 through December 31, 2003.

At step two, the ALJ found that Farren's only severe impairment was the fracture of her arm which was repaired by surgery in October 2001.  The ALJ classified Farren's telangiectasias as non-severe under the Act.  The ALJ noted that Farren did not claim that the marks were painful, and observed that there was nothing in the record to suggest that the marks would significantly impact Farren's ability to work.  The ALJ then found that Farren's clavicle fracture did not meet the durational requirement because it was resolved within one year, and the later worsening of her condition did not occur until after her last date of insurance coverage.

With regard to Farren's leg cramps, the ALJ noted that Farren's doctors suggested and the evidence indicated that her

liver disease "had started before 12/31/03, the date last insured (DLI), this was not yet a severe medically determinable impairment. The claimant sought treatment for other issues but did not present any severe symptoms caused by her liver disease until after the DLI." Thus, the ALJ found that Farren's leg cramps were not a severe impairment under the Act.

At step three, the ALJ found that Farren did not have an impairment or combination of impairments that met or was equivalent to one of the listed impairments in the regulations. The ALJ found that the record failed to establish that both of Farren's upper extremities were impaired, as required under Listing 1.02(B).

At step four, the ALJ found that Farren had the RFC to perform light work, except that she would need five additional bathroom breaks during an eight-hour workday. The ALJ found that Farren was not credible to the extent that her testimony as to the intensity, persistence, and limiting effects of her symptoms was inconsistent with her RFC. Based upon the VE's testimony, the ALJ concluded that Farren could perform her past relevant work as a bank teller and sales clerk. Thus, the ALJ concluded that Farren was not disabled under the Act.

## II.  STATUTORY FRAMEWORK

### A.  Standard of Review of an ALJ's Decision

The Social Security Act authorizes judicial review of social security disability determinations.  42 U.S.C. § 405(g).  A reviewing court is authorized to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.*

The factual findings of the Commissioner must be treated as conclusive if "supported by substantial evidence." *Id.*  Review is "limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Evidence is not insufficient under this standard merely because contradictory evidence exists in the record. *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998).

### B.  Standard for Entitlement to SSDI Benefits

The issue on appeal is whether Farren is "disabled" for purposes of the Social Security Act and is therefore eligible for SSDI benefits.  A "disability" is defined by the Act as an inability "to engage in any substantial gainful activity by

14

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period" of at least twelve months.  42 U.S.C. § 423(d)(2)(A).

An individual may only be considered disabled for purposes of receiving benefits if her impairment is "of such severity that [s]he is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A).

Under the relevant regulations, the Commissioner evaluates an individual's claim of disability, as was done here, under a five-step analysis.  20 C.F.R. §§ 404.1520(a).  If the Commissioner determines that the claimant fails any of the five steps, he can find that the claimant is not disabled under the Act and need not continue the sequential analysis.  *Id.* § 404.1520(a)(4).

Under the first step, a claimant is not considered disabled if she is engaged in "substantial gainful activity."  *Id.*  Under the second step, if the claimant does "not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that [are] severe and meets the duration requirement" the individual is not considered disabled.  *Id.*  Under the third

step, if a claimant's impairment meets or is equivalent to one specifically listed in the regulations and meets the duration requirement, the individual is deemed disabled. *Id.*

At the fourth step, the claimant's RFC is determined. Given the limitations found in the RFC, if the claimant is still capable of performing her past relevant work, she is not considered disabled. *Id.*

The fifth step considers the claimant's RFC as well as age, education, and work experience to determine whether the claimant can make an adjustment to other work. If an adjustment can be made, the claimant is not considered disabled. *Id.*

### III. DISCUSSION

Farren claims that the Commissioner made two errors in evaluating her claim, and therefore the denial of SSDI benefits should be reversed or remanded for further consideration. First, she claims that the ALJ erred by giving insufficient weight to Farren's treating sources' statements and thus finding that her end-stage liver disease was not a "severe" impairment under the Act. Second, Farren claims that the ALJ erred in finding her not credible, and therefore his decision was not supported by substantial evidence in the record. These claims will be addressed in turn.

<u>A.</u>   <u>Farren's Liver Disease</u>

Farren appears to claim that the ALJ gave insufficient weight to her treating sources' statements and therefore erroneously found that her end-stage liver disease was not severe under the Act.  However, the record as a whole fails to support her claim that her liver disease was a severe impairment under the Act.

Dr. Wax opined in 2000 that Farren's hemangiomata were due to poor liver functioning.  Dr. Saad thought that Farren's hemangiomata were consistent with estrogen influence, though he ultimately thought that it was also typical of alcohol hepatitis. Dr. McClellan, who performed Farren's blood tests, thought that Farren's enlarged red blood cells could have been due to a Vitamin B12 deficiency, though he also said that liver problems could be the cause.

Even if the ALJ had chosen to find that Farren's liver disease was well established before her insurance expired, Farren still failed to provide any evidence that the symptoms of her end-stage liver disease were severe under the Act.  To show that an impairment is "severe," a claimant must show that the impairment meaningfully limited her ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).

Here, the only thing that Farren can cite to are doctors who state that she had liver disease before 2004.  That does not mean

17

that her liver disease meaningfully limited her ability to do basic work activities. Indeed, the record is devoid of any such evidence; Farren never complained that the patches on her chest, back, and face were painful or that they limited her ability to do light or sedentary work in any way. Nor have any links been made during the relevant time period between any of Farren's impairments and liver disease. Farren only sought treatment for issues with her arm and shoulders during the relevant time period, but did not complain of any symptoms caused by her liver disease until 2004, after her insurance expired.

At step two, the claimant carries the burden of proof. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (holding that the claimant has the burden of proof for the first four steps of the sequential analysis). Because Farren failed to show any way in which her liver disease meaningfully limited her ability to do basic work activities during the relevant time period, the ALJ did not err in finding that her liver disease was not severe under the Act.[5]

---

[5] I note that even if the ALJ did err, it would be harmless because once one severe impairment is found, an ALJ must consider all severe and non-severe impairments in the remainder of the sequential analysis. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(2); *see also* SSR 96-8p. The ALJ properly proceeded to step three of the analysis based on a finding that Farren's shoulder injury was severe under the Act. Therefore, any error at step two was harmless. *Cf. Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that Mrs. Carpenter could not be denied benefits conclusively at step two and proceeded to the

B.    Credibility

Second, Farren appears to claim that the Commissioner erred in finding her not credible, and therefore the Commissioner's decision was not supported by substantial evidence. Specifically, she alleges that the ALJ erred in omitting references to her exhaustion, leg cramps, and confinement to a bed from his hypothetical to the VE, selectively crediting only her testimony that she needed multiple bathroom breaks.

A reviewing court must generally give deference to the Commissioner's credibility findings, for "resolution of conflicts in the evidence and the drawing of conclusions from such evidence are for the [Commissioner]." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).  Although the ALJ must take into account a claimant's subjective symptoms, *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 23 (1st Cir. 1986), he "may disregard subjective claims of pain if they are unsubstantiated and he does not credit them." *Mills v. Apfel*, 244 F.3d 1, 7 (1st Cir. 2001).  If he does so, he must specify the relevant evidence he considered in determining to disbelieve the claimant in a sufficiently clear manner to illuminate "the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p.

next step of the evaluation sequence.").

Farren testified that she had been experiencing terrible leg cramps since 1998 when she was working as a bank teller.  She testified that since she quit her job as a teller, she was limited to answering the phone from bed and occasionally filing paperwork.  On the other hand, the ALJ noted that Farren hadn't sought treatment for her leg cramps until after the relevant time period, and she testified that occasionally she would go out to do survey work with her husband which involved pounding stakes into the ground.  The ALJ thought that this undermined her testimony as to the intensity, persistence and limiting effects of her symptoms.

Other substantial evidence in the record, not cited by the ALJ, also supports her finding.  Farren testified that even when she could only answer the phone from bed, she would still go out every night to have four to six drinks with friends.  She took care of her grandchildren and her dog, made the bed, did laundry, cleaned the house, made dinner, drove a car, went to the supermarket, and shopped for an hour a week.  Though such activities do not, themselves, show an ability to work, they do support an ALJ's adverse credibility finding.  *Teixeira v. Astrue*, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a

negative credibility finding." (citing *Berrios Lopez v. Sec'y of Health and Human Servs.*, 951 F.2d 427, 429 (1st Cir. 1991))).

Farren's testimony regarding the severity of her impairments was contradicted by substantial evidence in the record, and therefore the ALJ did not err in finding her not credible.

## IV. CONCLUSION

Substantial evidence in the record supports the Commissioner's decision. For the reasons set forth above, he did not err. I therefore AFFIRM the Commissioner's decision by granting the Commissioner's motion for affirmance (#11) and denying Farren's motion for reversal (#7).


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE